EARLE v. McCARTNEY et al.

(Circuit Court, E. D. Pennsylvania. June 10, 1901.)

No. 1.

**1. FEDERAL COURTS—JURISDICTION—SUITS BY RECEIVER OF NATIONAL BANK.**

Act July 12, 1882, relating to national banks (22 Stat. 162, § 4), does not deprive a circuit court of the United States of the jurisdiction conferred by prior statutes over suits brought by receivers of such banks, without regard to the citizenship of the parties; but such jurisdiction is expressly recognized and preserved, both at law and in equity, where the suit is one brought by direction of the comptroller or for winding up the affairs of the bank, by the proviso to section 4 of the judiciary act of 1887–88.[1]

**2. FRAUDULENT CONVEYANCES—TRANSFER BY DEBTOR TO CREDITOR.**

Evidence *held* insufficient to establish the invalidity of a transfer of property by an insolvent debtor to certain of his creditors by way of security, either on the ground of duress, a fraudulent intent to hinder and delay creditors, or the insanity of the debtor.

**3. SAME—NECESSITY OF RECORDING—PENNSYLVANIA STATUTE.**

The provision of Act Pa. March 24, 1818, requiring all assignments in trust by debtors on account of inability at the time to pay their debts to be recorded within 30 days, and declaring them to be void if not so recorded, does not apply to a transfer made directly to a creditor for his benefit alone; and a transfer of property to the receiver of a bank, to secure a debt to the bank, is, in effect, one to the bank itself, and not in trust, and is not within the statute.

**4. EQUITY—SUBMISSION OF ISSUES TO JURY.**

A court of equity will not grant an issue to try before a jury questions of fact which have been fully heard before a master, whose findings thereon are approved by the court, where a contrary finding by the jury, if made, would not be followed.

In Equity. On exceptions to master's report and petition for an issue.

The following statement of facts is taken from the brief of counsel for complainant:

William M. Singerly was president, principal stockholder, and active manager of the Chestnut Street National Bank; also of the Chestnut Street Trust & Saving Fund Company. He also owned practically all the capital stock ($1,000,000) of the Record Publishing Company, and $500,000 mortgage bonds executed by that company, which stocks and bonds were pledged for debts aggregating almost a million dollars. He was president of the Record Publishing Company, and exercised general control over its affairs. He was president and principal stockholder of the Singerly Pulp & Paper Company. He also owned considerable property in the way of lands, etc.

He became indebted in a very large sum to the Chestnut Street National Bank. The amount of this has been determined by the master to be $1,149,266.50. He was also indebted to the trust company, as found by the master, in the sum of $728,033.21. He was indebted to other persons and corporations in various sums, aggregating a large amount. And his various corporations were likewise indebted in very large sums.

Singerly and his corporations had been in financial trouble for some time prior to December 23, 1897, and a plan had been devised to increase the Record Company stock $2,000,000 or over; and various clearing-house banks, with a view of saving the Chestnut Street Bank, indicated a willingness

---

[1] Citizenship as affecting the jurisdiction of the federal courts, see note to Shipp v. Williams, 10 C. C. A. 253.

to take this stock; and, with the means thus raised, Singerly intended to take care of his most pressing obligation, namely, that of the bank.

It was found, however, that his debts were greater than supposed, and the plan outlined would probably not accomplish the object, and it was abandoned.

December 23, 1897, the bank and trust company failed to open their doors, and the trust company at once made a general assignment for the benefit of its creditors to Messrs. Richard Y. Cook and George H. Earle, Jr., and on the same day the comptroller of the currency (Mr. Eckels) took possession of the bank through the bank examiner. On January 29, 1898, Comptroller Dawes appointed George H. Earle, Jr., receiver of the bank.

At various times after the bank's failure Singerly expressed his willingness and intention to do all he could to protect the bank and trust company. Accordingly on February 10, 1898, he transferred to George H. Earle, Jr., as receiver of the bank, all his equity in the Record stock and bonds, and by a subsequent instrument he transferred the remaining equity to the assignees of the trust company.

Both these transfers provided that, in case a plan should finally be put on foot for the reorganization of his affairs, then the receiver and assignees should release the security obtained under these two transfers.

Singerly died on February 27, 1898. Soon thereafter various creditors holding his Record stock and bonds as collateral threatened and began selling the same to satisfy their claims, and it became evident that if anything was to be realized out of the equity in these securities under the transfers of February 10, 1898, something must be done to protect the securities from forced sales.

With this in view, the Finance Company, the Pennsylvania Warehousing Company, and the Guarantee Trust & Safe-Deposit Company, cross complainants herein, acting under an arrangement with the comptroller of the currency, advanced the moneys necessary to protect the Record stock and bonds, and thus secured possession of the greater part of the $1,000,000 of stock and $500,000 bonds, and have held them until the present time. This action is brought by the receiver of the bank, holding the second lien, to marshal liens and secure a sale under the order of court of all these securities, in order to satisfy the liens in their order. The respondents named are the assignees of the trust company, holding the third lien; J. S. McCartney, as administrator of Singerly's estate, claiming the ultimate equity of redemption, and now attacking the second and third liens; Messrs. Earle and Cook, as managers of a certain reorganization plan; and the Finance, Warehouse & Guarantee Trust Company, holders of the first lien.

Demurrers to the bill and cross bill were filed by the administrator. The same were overruled. Various issues were then raised by answers, and a reference made to Hon. James M. Beck, as master and examiner.

The report of the master and examiner is in favor of the complainant and the assignees of the trust company upon their cross bill. There is practically no dispute as to the first lien.

Asa W. Waters, Charles Biddle, Austin Lynch, and John G. Johnson, for complainant.

A. S. L. Shields, J. Howard Gendell, and George T. Bispham, for respondent.

J. B. McPHERSON, District Judge. In view of the very careful and satisfactory report of the learned master, an elaborate discussion of the exceptions seems unnecessary. I have considered them all in connection with the testimony, and with the written and oral arguments of counsel, by which I have been much helped in coming at once to the points in dispute; but I am unable to sustain more than one of the respondent's positions, namely, the objection to the calculation of interest.

The principal dispute concerns the validity of the papers executed by Mr. Singerly on February 10, 1898. These are attacked on four grounds: insanity of the decedent, duress, fraudulent intent to hinder and delay creditors, and failure to record within the statutory period. There is no evidence to sustain the allegation of duress, and very little more—certainly much less than is needed—to sustain the allegation of a fraudulent intent to delay and hinder other creditors. Upon the issue of insanity, evidence was offered that, no doubt, called upon the complainant for a reply; but the reply was amply sufficient, and I agree fully with the master in finding that Mr. Singerly was sane at the time the assignments were executed. Within several months preceding his death, his habits were undeniably bad. He drank heavily on several occasions, and probably drank in smaller quantities at more frequent intervals; but the evidence that he was competent to attend to business, that he was actually attending to a varied and complicated business during most of that period, and that he was always fit to attend to it when he was sober, is overwhelming. Failure to record would, of course, be fatal, if the paper now in question was equivalent to a general assignment for the benefit of creditors; but, in my opinion, it was a transaction of a different kind, namely, a direct transfer to certain creditors themselves of securities by which the decedent desired them to profit. The receiver should be regarded as the direct representative of the creditors for the purpose of taking these bonds and stocks.

With regard to the Elkins and Widener stocks, I think it need only be said that no good ground appears for objecting to a transaction that undoubtedly prevented the sacrifice of valuable assets belonging to Mr. Singerly's estate, and resulted in the pledge of these assets as security for his own debt, especially when it is considered that he intended these very assets to stand as an ultimate security for this very debt. The form of the transaction may, perhaps, permit a more or less plausible attack to be made upon technical grounds; but, in substance, what was done was fair and equitable, and, as I think, beyond successful objection.

The jurisdiction of this court is, I think, scarcely open to dispute. I shall add nothing to what the master has said upon this subject.

I am asked, also, to grant an issue to try before a jury the questions whether the papers of February 10th were executed for the purpose of delaying and hindering creditors, and whether at the time of their execution Mr. Singerly was of unsound mind, or was acting under duress. These questions have been fully heard before the master, and have now been considered by the court. I see no advantage to be gained by going over the ground again, especially in view of the fact that, if the finding should be against the validity of the papers, I should not feel at liberty to follow it. The application for an issue is accordingly refused.

I think, therefore, that the prayers of the bill and the cross bill should be granted, and that the bonds and stocks should be sold. A decree may be drawn accordingly, and after a sale has taken place the fund produced thereby will be distributed. Upon the distribution the questions of interest and costs will be more properly raised, but

I may perhaps say now that at present I am of the opinion that interest should not be computed to October 1, 1900, upon the complainant's claims, since such calculation would result in compounding the interest from that date.